# In re Center Township Democratic Party Supervisor Primary Election

*Samuel J. Orr III,* for petitioner.
*John A. Havey,* for respondent.

STEEGE, *J.,* August 4, 1989 — Before us is a contested nomination of class V (so designated by section 1711 of the Election Code, Act of June 3, 1937, P.L. 1333, 25 P.S. §3291). The proceeding was begun by the filing of a petition pursuant to section 1756 of the code, 25 P.S. §3456, and jurisdiction to try and decide the matter is conferred upon the court by code section 1751, 25 P.S. §3431.

The petition contests the nomination of one of two Democratic nominees for the office of Center Township supervisor in the primary election held on May 16, 1989. An answer to the petition was filed, and the issues joined in the petition and answer were fully heard in a hearing which began on July 24 and ended on July 25, 1989. On July 26, 1989, we entered an order voiding the nomination of Samuel J. Lucci III as one of two Democratic nominees for the office of Center Township supervisor, and we directed the Bureau of Elections to schedule and conduct a run-off election between

Lucci and William DiCioccio in order to determine which of those two persons shall be the second Democratic nominee for the office of Center Township Supervisor in the November 1989 general municipal election. The purpose of this opinion is to set forth findings of fact and conclusions of law in support of the July 26 order, in compliance with section 1773 of the code, 25 P.S. §3473.

We make the following

## FINDINGS OF FACT

(1) Of the 30 persons who signed the petition, 29 are duly registered democratic electors who voted in the primary.

(2) Two Center Township supervisors are to be elected in the municipal election. Two Democratic nominees for the office of Center Township supervisor were to be nominated in the primary,[1] to appear on the municipal election ballot.

(3) For several years there have been two competing political factions within the Democratic Party in Center Township, designated respectively (at least during election year 1989 and for our purposes) as the Center Democratic Committee and the United Center Democrats. Both factions ran full slates of candidates for local office in the primary, including two candidates for township supervisor, the slate of the United Center Democrats being designated by that name, the slate of the Center Democratic Committee being designated as the "Gold Medal Team."

---

1. Four candidates for positions on the Center Area School Board, a candidate for auditor, and a candidate for tax collector were also to be nominated and were nominated. Those nominations are not before us. In addition, as is set forth in the July 26 order, the nomination of Anthony H. Amadio as one of the Democratic nominees for the office of Center Township supervisor is unaffected by the July 26 order.

(4) The candidates for township supervisor on the United Center Democrats' slate were DiCioccio and Anthony H. Amadio.

(5) The candidates for township supervisor on the Gold Medal Team were Lucci and Frank J. Mancini.

(6) Paul G. Vukas was a candidate for school director in the primary on the Gold Medal Team. Throughout the primary campaign, Vukas actively worked and campaigned for himself and for all the candidates on the Gold Medal Team.

(7) During the primary campaign, beginning at least in early 1989, the Center Democratic Committee (or the Gold Medal Team) had its headquarters in a building located at 1438 North Brodhead Road in Center Township. That building is owned by Louis J. Elias and Catherine Elias, his wife, and George Elias Jr.

(8) Louis J. Elias is aligned politically with the Center Democratic Committee, having previously been elected to the Center Area School Board as a candidate of that faction.

(9) Nikki Kanakis, of Ambridge, Carie L. Gibbs, of Bridgewater, and Jason W. Robbins, of New Brighton, were at all relevant times students at the Penn State Campus in Center Township, living in their respective family homes. Each signed a partially completed voter registration card at the request of some person unknown. Those registration cards, when filed, registered each of them as Republican voters living at 1438 Brodhead Road in Center Township. None of them has ever lived at that address or anywhere in Center Township.

(10) William F. Carns, an apparently fictitious person, was registered on April 8, 1989 as a Democratic voter living at 1438 Brodhead Road, Center

Township. Carns, if he exists, has never lived at that address nor has he ever been a student at the Penn State campus.

(11) On May 5, 1989, Vukas delivered to the Election Bureau applications for absentee ballots on behalf of Kanakis, Gibbs, Robbins and Carns. Absentee ballots were delivered to him, and he "hand carried" them from the Election Bureau office.

(12) Neither Kanakis, Gibbs, Robbins nor Carns, if he exists, applied for absentee ballots nor were absentee ballots ever delivered to them. None voted an absentee ballot in the primary. Nonetheless, voted absentee ballots under their names were received by the Election Bureau and placed in the appropriate ballot box for delivery to the polling place. Those four absentee ballots were successfully challenged and were not counted.

(13) At varying times beginning in the fall of 1987 and through April 1989, the following persons were registered as Democratic electors residing at 1438 Brodhead Road in Center Township:

| | |
|---|---|
| Patrick C. McMullen | John Rosen |
| Scott L. Battle | Carla Schoentag |
| Kevin Bowser | David Corriero |
| Douglas T. Geinzer | Moses Summers |
| Gerald G. Oswald | |

McMullen, Battle, Bowser, and Geinzer were tenants living at 1438 Brodhead Road during at least a part of that time period. None of the other persons, if he or she exists, has ever lived at that address.

(14) None of the persons or purported persons named in the previous paragraph voted in the primary, nor was any attempt made to cast a vote on his or her behalf.

(15) On March 2, 1989, March 9, 1989, and April

14, 1989, as the respective records of the Election Bureau will reveal, at various addresses throughout Center Township, the following 15 fictitious persons were registered as Democratic electors in Center Township:

(1) Kathy R. Trimble
(2) Clyde A. Trimble
(3) John B. Trimble
(4) Mary A. Trimble
(5) Gloria Austin
(6) Rhonda A. Reynolds
(7) Kevin D. Reynolds
(8) Betty J. Reynolds
(9) John Reynolds
(10) Kimberly M. Rankin
(11) Louise Hayden
(12) Carol A. Longo
(13) John Shadley
(14) Carl L. Hayden
(15) Joanne R. Casey

None of those persons lives, nor during the past several years has he or she ever lived, at the addresses given on their respective registration cards. We specifically find that none of those. persons exists; we shall hereinafter collectively refer to them as the "Fictitious Fifteen."

(16) On May 5, 1989, applications for absentee ballots were delivered to the Election Bureau on behalf of each of the Fictitious Fifteen. There being registrations on file for all of them, the absentee ballots were issued.

(17) On the· same day, the absentee ballots made out for the Fictitious Fifteen were delivered to Vukas, who signed for them in the Election Bureau office and hand carried them away. Vukas's signed receipts for the absentee ballots, and the notations that he hand carried them out, are· a part of the permanent records in the Election Bureau office.

(18) Voted absentee ballots were returned to the Election Bureau on behalf of all the Fictitious Fifteen. They were placed in the appropriate ballot boxes, sent to the local polling places, voted, and counted. They are not now identifiable.

(19) The returns for the primary in Center Township include the votes which appear on the fraudulent ballots which were cast on behalf of the Fictitious Fifteen.

(20) The vote count in the primary for the Democratic nomination for Center Township supervisor was as follows:

| | |
|---|---|
| Lucci | 1,619 |
| Mancini | 1,469 |
| Amadio | 1,699 |
| DiCioccio | 1,605 |
| Scattered Votes | 4 |

## DISCUSSION AND CONCLUSIONS

In entering the July 26 order, which grants extraordinary relief, we acted under the powers and duties imposed upon the court by section 1764 of the Election Code, 25 P.S. §3464. That section reads as follows:

"All of the said courts [of common pleas] and judges hereby required to try any contested election case shall have plenary power to make, issue and enforce all necessary orders, rules, process and decrees, for a full and proper understanding and final determination and enforcement of the decision of every such case, according to the course of practice in similar cases under the laws of this commonwealth, or which may be necessary and proper to carry out the provisions of this article."

We read that provision as granting to us the power and imposing upon us the duty to preserve and protect the integrity of the electoral process. When the electoral process has been undermined by fraudulent and perhaps criminal conduct, our

duty to act is overwhelming, particularly where, as here, the fraud may have altered the outcome of the election.

The undisputed facts of this case speak for themselves.[2] Voter registrations have been filed, applications for absentee ballots have been made, and absentee ballots have been cast and counted in the names of 15 persons who do not exist. (Persons having the same names as some or all of the Fictitious Fifteen may well exist, but that is only a coincidence.) While no finding can be made as to who filed the registrations, made the absentee ballot applications, or voted the absentee ballots, Vukas signed for, received, and hand carried the absentee ballots from the Election Bureau office.[3] Vukas was a political ally and Gold Medal Team running-mate of Lucci's, and the final vote count showed Lucci 14 votes ahead of DiCioccio.

The 15 fraudulent absentee ballots are not now identifiable, and we cannot and do not find that any or all of the fraudulent ballots cast a vote for Lucci while casting no vote for DiCioccio. However, it is not unreasonable to infer (as DiCioccio and his allies must certainly infer) that all 15 fraudulent votes were cast for Lucci and against DiCioccio and the nomination thereby lost. The clear evidence of fraud, and the possibility that the fraud may have altered

---

2. Respondent offered no testimony at the hearing, and he stipulated that all 15 of the voter registration cards and absentee ballots filed on behalf of the Fictitious Fifteen were written by the same person.

3. Vukas was not called to testify. Petitioners' counsel informed us on the record that Vukas had been subpoenaed but his lawyer had advised that, if called, Vukas would plead the privilege against self-incrimination and not testify. The subpoena was not pursued.

the outcome of the election, require that Lucci's nomination be voided and the run-off election be held.

The action which we have taken is not without precedent. In *Bright's Contested Election*, 292 Pa. 389, 141 Atl. 254 (1928), the trial court had found massive fraud, intimidation, and illegal voting had occurred at one polling place. Concluding that it could not determine which of the votes cast at that polling place were lawful and which were not, the trial court rejected and threw out the entire vote count. Concurring with the finding that the "illegal votes cannot be identified," the Supreme Court affirmed the rejection of the entire vote cast. The Supreme Court specifically held that when it is not possible to separate the lawful ballots from the unlawful or fraudulent ballots, then the entire vote must be rejected and thrown out.

The similarity to the case at bar is obvious. Here the ballots cast on behalf of the Fictitious Fifteen cannot be identified and separated out. While we do not know for whom, if anyone, those ballots were cast, they may have altered the outcome.

In *Bright,* the court cited and followed *West Mahanoy Township's Contested Election*, 258 Pa. 176, 101 Atl. 946 (1917). In *West Mahanoy*, which concededly presented a much more outrageous situation than the case at bar, there had been massive fraud, coercion and physical intimidation at one voting precinct. The trial court held that the election in that precinct had been null and void and threw out the entire return from it, a result which altered the election. Finding that "the conditions that existed at the [polling place on election day] were as disgraceful as they are inconceivable," the Supreme Court affirmed. The Supreme Court held

that, where possible, the fraudulent votes should be stricken, but when that cannot be done, all returns from the voting district in which the fraud occurred should be thrown out.

The legal principle which governs us here was well set forth by the Supreme Court in *Gollmar's Election Case,* 316 Pa. 560, 175 Atl. 510 (1934), as follows:

"There is no doubt that where such glaring fraud and illegality exists as to make it impossible to purge the ballot boxes with any degree of accuracy, the court may reject the whole vote of any or several districts."

There is glaring fraud and illegality here, and it is impossible to identify the fraudulent ballots. We are empowered to reject the entire Lucci-DiCioccio vote as counted in the primary, and we have done that.

We point out that there is not a shred of evidence in this record linking Lucci with the fraud. Indeed, as events have unfolded, he may be the biggest victim of it. However, we cannot be mindful of personalities in carrying out our constitutional and statutory duty. Voiding Lucci's nomination was the necessary remedy to counteract the fraud.

Finally, we are aware that the district attorney is pursuing a criminal investigation into the facts and circumstances which have given rise to this case. If a prosecution should be initiated, and a conviction or convictions follow, we suggest that a recommendation be made at the time of sentencing that the guilty person or persons be ordered to make restitution to Beaver County for the cost of the special election.